IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


RONALD J. LEAR,                              )
                                             )
                Plaintiff,                   )
                                             )
        v.                                   )        Civil Action    02-1747
                                             )
BOROUGH OF BRENTWOOD, OFFICER                )
MILTON MULHOLLAND, III,                      )
                                             )
                Defendants.                  )


MEMORANDUM ORDER

CONTI, District Judge

        In this memorandum order, the court considers the motion for partial summary judgment

filed by plaintiff Ronald J. Lear ("plaintiff" or "Lear") and the motion for summary judgment

filed by defendants Borough of Brentwood (the "borough") and Officer Milton Mulholland, III

("Mulholland")( together with the borough referred to collectively as "defendants").  After

considering the joint statement of material facts, the motions and the briefs submitted by the

parties, the court will grant defendants' motion in part by dismissing the claims against the

borough and by reason of qualified immunity will dismiss plaintiff's claim against Mulholland

relating to plaintiff's involuntary commitment.  The court will deny the remainder of defendants'

motion as well as the plaintiff's motion in its entirety for the reasons set forth in this opinion.

### *Factual Background*

Plaintiff is an adult individual, residing at 423 East Garden Street, Brentwood, Pennsylvania with his wife Carol Lear.  Joint Statement of Material Facts ("J.S.") ¶ 1.  The house located immediately next door to plaintiff's residence, on the east side, is owned by Norman and Laura Schmidt (the "Schmidts").  J.S. ¶ 2.  The Schmidts' home address is 421 East Garden Street.  Id.  In the past, the Schmidts had confrontations with Lear, including some that required the summoning of law enforcement to the neighborhood.  Id. ¶ 5.

On July 21, 2002, at 4:30 p.m., Laura Schmidt ("L. Schmidt") placed a telephone call to the Brentwood Police Department.  Id. ¶ 3.  During the telephone call, L. Schmidt stated the following:

> This is Laura Schmidt at 421 East Garden.
> My neighbor is carrying on and he is out on
> the front street with a gun.  I don't know
> what kind it is, but it's a gun.

Id. ¶ 3.  L. Schmidt stated, in response to questions from the emergency dispatcher, that the gun was "a big handgun" and that the name of the person carrying the gun was "Ron Lear."  Id. ¶ 4.

In response to the call from L. Schmidt, Mulholland and Officer Mike Fisher ("Fisher") were dispatched to 421 East Garden Road.  Id. ¶ 6.  The radio dispatcher informed Mulholland and Fisher that "there was a man out on the front street with a gun, a handgun in his hand."  Id. ¶ 6.  Mulholland and Fisher were further informed that the man with the gun was a 60-year old white male "who lives right next door this address–he lives at 423."  Id. ¶ 7.  Neither Mulholland nor Fisher heard the telephone call from L. Schmidt to the Brentwood Police Department.  Id. ¶ 8.  The only information available to Mulholland and Fisher was the information given to them

2

by the radio dispatcher.  Id.  No one informed Mulholland and Fisher, prior to their arrival at 421

East Garden Road, that the man with the gun had pointed it at, or threatened to shoot at, anyone.

Id. ¶¶ 9-10.  Prior to their arrival, the Brentwood Police Department had not received a report

indicating that Lear had fired a gun at anyone.  Id. ¶ 11.

As Mulholland and Fisher arrived at the scene, Lear was not visible outside and contact

was sought with Lear's residence.  Id. ¶ 12.  When Mulholland and Fisher arrived, no one on the

street appeared to be in danger of any physical harm of a man with a gun.  Id. ¶ 14.

Mulholland was the officer in charge at the scene.  Id. ¶ 15.  Mulholland recalled arriving

on the scene "within a minute" of receiving the dispatch.  Id. ¶ 16.  Mulholland stated that, after

he arrived on the scene and as he approached the Schmidts' residence, L. Schmidt came to the

front door of the house.  Id. ¶ 17.  Mulholland recalled L. Schmidt telling him that the "man next

door in front of her house... [had]...a big handgun."  Id. ¶ 18.  Mulholland also stated, however,

that L. Schmidt did not inform him or state that the man had pointed the gun at her or anyone

else.  Id. ¶¶ 19-20.

L. Schmidt described the man to Mulholland as being loud and boisterous, but could not

hear any words spoken by him.  Id. ¶ 22.  Mulholland then requested that the Brentwood Police

Department attempt to establish a telephone connection with Lear's residence.  Id. ¶ 27.  The

Brentwood Police Department was unable to establish a telephone connection with Lear's

residence due to a busy signal.  Id. ¶ 28.  Carol Lear, wife of Lear, testified that the Lear

residence contained only one telephone line and that she was conversing on that line during the

time that the police arrived.  Id. ¶ 29.  Due to the Brentwood Police Department's inability to

establish contact with the Lear residence, Mulholland requested that the telephone operator's

assistance be sought to break through the busy signal on the Lear residence's telephone line. Id. ¶ 28.

After arriving on the scene, Mulholland set up a perimeter around the Lear residence. Id. ¶ 30. Mulholland said to Lear to "take a step out" of his residence. Id. ¶ 33. As the Lears exited their residence, police officers were surrounding the area. Id. ¶ 35. Immediately upon exiting his residence, Lear was handcuffed. Id. ¶ 36. Lear remained outside of his residence, handcuffed in the street, while it was searched by police officers. Id. ¶¶ 36, 38. Lear was held in custody outside of his home for 2-3 minutes and did not engage in behavior indicating an immediate threat of harm. Id. ¶ 40. Prior to Mulholland ordering Lear to exit his residence, there was sufficient time for Mulholland, or another police officer, to have obtained a warrant for Lear's arrest, if sufficient grounds existed for Lear's arrest. Id. ¶ 41. No attempt was made to obtain an arrest warrant for Lear. Id. ¶ 42.

Prior to Mulholland requesting Lear to exit his residence, Mulholland had not formed an opinion as to whether Lear was suffering from a mental disorder. Id. ¶ 43. Following the police officers' sweep of the Lear residence, Lear was returned to his residence, still in handcuffs, and seated on the couch in his living room. Id. ¶ 44. Mulholland then had a discussion with Lear. Id. ¶ 48. The tone of the discussion was conversational. Id. Lear informed Mulholland that he was upset over damage done to his driveway by the Schmidts. Ex. F, at 76-78. During that conversation with Mulholland, Mulholland claims that Lear said he was going to "fix" his neighbors ( Id. ¶ 55), and that Lear also told Mulholland that he was outside of his residence with the pellet gun in order to "scare his neighbors"–the Schmidts. Id. ¶ 56. Shortly after Lear

4

returned to his residence, Mulholland and Fisher were informed, after speaking with Lear, that the "gun" referred to by Schmidt was a pellet gun.  Id. ¶¶ 45, 47.

Mulholland, after Lear was placed back in his residence, proceeded to leave the house and speak with L. Schmidt and Betty Couch ("Couch").  Id. ¶ 46.  Upon speaking with L. Schmidt, Mullholland proceeded to inspect Lear's driveway for any damage or vandalism.  Ex. F, pgs. 86-87.  Mullholland found no evidence of any damage.  Id.  Lear then spoke with Couch and then returned to the Lear residence and spoke to Lear.  Id. at 88-9.  After Mulholland's discussion with Lear, and while Mulholland was speaking with L. Schmidt and Couch, Carol Lear retrieved the pellet gun and presented it to Fisher.  J.S. ¶ 59.  Couch is Lear's next-door neighbor to the east.  Id. ¶ 51.  During L. Schmidt's conversation with Mulholland, she was emotional and upset and indicated that she feared Lear.  Id. ¶ 50.

After being taken into custody by Mulholland and Fisher, Lear was placed in a jail cell.  Id. ¶ 65.  While Lear was in his cell, Mulholland heard a loud thump.  Id. ¶ 67.  Lear was screaming in his cell for an attorney at the time.  Id.  Mulholland questioned whether Lear was unconscious after the thump and summoned Emergency Medical Services to transport Lear to the hospital.  Id. ¶ 68.  Lear was transported to Jefferson Memorial Hospital by ambulance and involuntarily committed for a mental health evaluation.  Id. ¶ 70.

Borough police officers receive training at the police academy as well as yearly updates on dealing with mentally disturbed citizens.  Exhibit A, at 24.  In the borough, "very few" citizens are subject to involuntary commitments.  Id. at 22.  Within two years prior to the date of Lear's involuntary commitment, borough police officers attended a class on how to deal with mentally disturbed citizens.  Id.  Finally, all police officers in the Commonwealth of Pennsylvania must attend yearly classes administered under the auspices of the Municipal Police

Officers Training and Education Commission and pass a test based on the material taught. Exhibit T, at 16. In 2002, the classes contained a course dealing with mental health and behavioral health issues.  Id.

### *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c).  A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party.  Id. at 249.  The court may consider any material or evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment.  Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993) (citing WRIGHT AND MILLER, FEDERAL PRACTICE § 2721); Pollack v. City of Newark, 147 F.Supp. 35, 39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d Cir. 1957), cert.denied, 355 U.S. 964 (1958) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or *otherwise made admissible in evidence*") (emphasis added).

*Analysis*

## I.    Qualified Immunity–Claims Against Mulholland

Defendants assert that Mulholland is entitled to summary judgment in his favor on all claims made against him on the ground of qualified immunity. The Supreme Court recognized that suits against state officials are another way of suing a state. Hafer v. Melo, 502 U.S. 21, 25 (1991). When sued in their personal capacities, state officers or officials, however, come to court as individuals. Id. at 27. A state official, when sued as an individual, fits within the statutory term "person" under 42 U.S.C. § 1983. Id.

The privilege of qualified immunity recognizes the balance between the need for a forum to vindicate the abuse of federal rights and the "substantial societal costs" entailed in opening government officials to suit for the discretionary exercise of their public duties. Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982). The United States Supreme Court resolved these competing concerns "by generally providing government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 632, 638 (1987).[1]

An objective inquiry is required into the reasonableness of the actions of government officials that permits government officials to anticipate when their conduct may give rise to liability for damages. Id. at 645-66. The privilege affords "protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341

---

[1] The United States Court of Appeals for the Third Circuit recognized "that there is a compelling need for such protective doctrine because of the severe chilling effect numerous suits for damages would have on prospective officials." Acierno v. Cloutier, 40 F.3d 597, 615 (3d Cir. 1994).

(1986).  "Thus, law enforcement officials who 'reasonably but mistakenly' conclude that their conduct comports with the requirements of the Fourth Amendment are entitled to immunity." Sharrar v. Felsing, 128 F.3d 810, 826 (3d Cir. 1997)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)).  When it attaches, the privilege of qualified immunity "is an *immunity from suit* rather than a mere defense to liability" which is lost if defendants are permitted to go to trial.  Saucier v. Katz, 533 U.S. 194, 200-01 (2001).[2]  Once qualified immunity is asserted by a defendant, the plaintiff has the burden of demonstrating the privilege should not attach.  McLaughlin v. Watson, 271 F.3d 566, 570 (3d Cir. 2001).

An analytical framework was developed to test whether a defendant is entitled to qualified immunity.  Under this framework, the inquiry into the claim of qualified immunity is distinct from the inquiry into the merits of the claim.  Saucier, 533 U.S. at 197.  First, the court must determine whether the facts, taken in a light most favorable to the plaintiff's allegations, show that defendant's conduct violated a federal right or constituted a constitutional violation. Id. at 201.  In determining this first step, the court should "set forth principles which will become the basis for a holding that a right is clearly established."  Id.

If a federal right would be violated based upon a plaintiff's allegations, the court must move to the next step: whether the federal right alleged to be violated was clearly established to a degree of particularity within the specific context of the case at issue.  Id.  A broad and generalized declaration that a clearly established federal right was violated is insufficient. Anderson, 483 U.S. at 640.  For example, in Anderson, the Supreme Court determined that for purposes of applying the qualified immunity privilege, the simple assertion that the Fourth

---

[2]The Supreme Court "repeatedly . . . stressed the importance of resolving immunity questions at the earliest stage in litigation."  Saucier, 533 U.S. at 201 (citing Hunter v. Bryant, 502 U.S. 224, 227 (1991) (*per curiam*)).

Amendment prohibits warrantless searches without probable cause and exigent circumstances was not enough to demonstrate that the defendants' conduct violated a "clearly established" right under the particular facts of that case.  Id. at 640-41.  Instead, the Court stated that, in order for a right to be "clearly established,"  "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Id.

If a rule requiring particularity was not in place, "[p]laintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."  Id. at 639.  The net effect would be to transform "a guarantee of immunity into a rule of pleading."  Id.   Thus, for the second prong of the framework, a right is "clearly established" where "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier, 533 U.S. at 202.  If the court determines that a review of the particular context demonstrates that the rights alleged to have been violated have been "clearly established," the court reaches the third and final step in the analytic framework: "whether a reasonable government official should have known that the alleged action violated the plaintiffs' rights."  Doe v. County of Centre, Pa., 242 F.3d 437, 454 (3d Cir. 2001).

The Supreme Court of the United States instructs that determining whether a right was "clearly established depends, in large degree, on the degree of particularity within the specific context of the case at issue."  Saucier, 533 U.S. at 197.  Other courts have noted that a public official is considered to have constructive knowledge of established law.  Cannon v. City & County of Denver, 998 F.2d 867, 874 n.6 (10th Cir. 1993).   In addition, the Supreme Court has instructed lower courts to apply all precedents within their knowledge in deciding the issue of qualified immunity.  Elder v. Holloway, 510 U.S. 510 (1994).

Plaintiff claims that Mulholland is not entitled to qualified immunity and that Mulholland violated plaintiff's constitutional rights because he was illegally seized in violation of the Fourth Amendment[3], the warrantless search of his home violated the Fourth Amendment, and his Fourth Amendment rights were violated when he was involuntarily committed. The court will address each of plaintiff's arguments.

### a.                        Illegal seizure of plaintiff

Plaintiff argues that exigent circumstances did not justify an arrest of plaintiff in his home. "Although police may make a warrantless search in a public place if they have probable cause to believe the suspect is a felon, 'the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Sharrar, 128 F.3d at 819(quoting Payton v. New York, 445 U.S. 573, 590 (1980)). The issue of when an arrest actually occurs has been repeatedly litigated. Two decisions illustrate the issue. In I.N.S. v. Delgado, 466 U.S. 210, 215 (1984), the United States Supreme Court held that a person is seized, for Fourth Amendment purposes, "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Later, in California v. Hodari D., 499 U.S. 621, 626 (1991), the Supreme Court held that an arrest is characterized as requiring either physical force or submission to the assertion of authority.

The parties agree that Lear was arrested without a warrant. Defendants argue that exigent circumstances permitted Mulholland to arrest plaintiff. The government, or borough in this case, bears the burden of showing that exigent circumstances existed to overcome the presumption that

---

[3]The Fourth Amendment is applicable to state action via the Due Process Clause of the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 646-53 (1961).

home arrests made without a warrant are unreasonable.  <u>Welsh v. Wisconsin</u>, 466 U.S. 740, 750

(1984).  The United States Supreme Court in <u>Minnesota v. Olson</u>, 495 U.S. 91, 100 (1990),

found that the Minnesota Supreme Court correctly outlined the parameters of exigent

circumstances in this context.  "'[A] warrantless intrusion may be justified by hot pursuit of a

fleeing felon, or imminent destruction of evidence, ... or the need to prevent a suspect's escape,

or the risk of danger to the police or to other persons inside or outside the dwelling'."  <u>Id.</u>

(quoting <u>State v. Olson</u>, 436 N.W.2d 92, 97 (Minn. 1989))(citations omitted); <u>see</u> <u>Sharrar</u>, 128

F.3d at 820 (quoting <u>Olson</u>).

     In this case, the court recognizes that the first and second steps of the analytical

framework relating to qualified immunity are met because the right to be free from arrest in one's

home, absent the existence of one of the above listed exigent circumstances, is a clearly

established constitutional right.  Under the third step in the analysis the court must now consider

the particular facts of this case to determine whether a reasonable police officer should have

known that the arrest was unlawful.

     Mulholland, while on patrol, received a call from the borough dispatcher indicating that a

man was in the street waving a gun at his neighbors.  When Mulholland arrived on the scene,

Lear was not in the street, and no one on the street appeared to be in any danger.  Mulholland

spoke with L. Schmidt and she stated to him that Lear was in the street with a gun and speaking

in a  loud and boisterous manner.  Mulholland instructed the dispatcher to attempt to establish a

phone connection with the Lear residence.  The dispatcher was unable to do so.  Mulholland set

up a perimeter around the Lear residence and Lear was placed in handcuffs after exiting his

home.

The exigent circumstances implicated in this case are "hot pursuit," fleeing, escape, or danger to other citizens.  There was no evidence of record to support a finding of "hot pursuit" in this case.  Specifically, Lear was inside his residence and Mulholland established a perimeter around it.  Lear was not able to flee or escape.  In addition, there is no evidence of record to support the finding that there was a danger of evidence being destroyed within the Lear residence.  The final issue is the risk of danger to persons inside or outside of the dwelling.  The fact that Mulholland was told that Lear had a gun inside the residence could lead to the inference that Lear was a danger to himself or to others.  The United States Court of Appeals for the Third Circuit, however, addressed this issue in Sharrar.  The court held: "The mere possession of a gun, which as far as the officers knew had been used only once and then against Bridgen's wife, no matter how grievous a crime, does not necessarily reflect exigent circumstances."  Sharrar, 128 F. 3d at 820.  The circumstances in Sharrar, including the beating of defendant's wife with the gun, were far more dangerous than the facts here.  Similarly, as in Sharrar, Mulholland does not satisfactorily explain why he could not simply have secured the premises and proceeded to secure an arrest warrant.  The parties dispute other facts relevant to exigent circumstances, *i.e.* whether Mulholland knew or had information that anyone in the Lear home was in danger.  J.S. § 37.  In these circumstances, a court may not grant qualified immunity because in determining whether to grant a motion for summary judgment all factual disputes must be resolved in favor of the non-moving party.  See Harvey v. Plains Township Police Dept., 421 F.3d 185, 194 n.12 (3d Cir. 2005).  For the above reasons, the court finds that considering all disputed facts in favor of the non-moving party, a reasonable officer would not have proceeded to arrest Lear at his home

absent a warrant.[4]  Defendants' motion for summary judgment for qualified immunity relating to plaintiff's claim that Mulholland violated plaintiff's Fourth Amendment rights by an illegal seizure of plaintiff is denied.

### b.                    Warrantless Search of Residence

The second issue to be addressed is Mulholland's warrantless search, or protective sweep, of Lear's residence.  The United States Supreme Court defined a protective sweep as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers and others."  Maryland v. Buie, 494 U.S. 325, 327 (1990).  The court in Buie further held that the sweep must be limited to searches of "closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched."  Id. at 334.  If a search goes beyond the immediate, adjoining area, there must be "articulable facts" which would warrant a reasonable police officer "to believe that there are individuals who pose a danger in other areas of the house."  Sharrar, 128 F.3d at 822 (quoting Buie, 494 U.S. at 334).

In Sharrar, the United States Court of Appeals for the Third Circuit resisted imposing a bright line rule limiting protective sweeps to in-home arrests.  Id. at 824.  Instead, the court held that protective sweeps should be considered under the "articulable basis" standard outlined by the Supreme Court in Buie.  Id.

The facts of record in this case show that Lear was already handcuffed and restrained prior to the search of Lear's residence.  Mulholland was told that Lear was the man that was waving the gun in the street.  The parties dispute whether Mulholland had any reason to believe

---

[4]The court notes that the United States Court of Appeals for the Third Circuit held in United States v. Myers, 308 F.3d 251, 256 (3d Cir. 2002), that Pennsylvania law has "specifically limited the authority of police officers to make warrantless arrests for misdemeanor offenses." Id.  An officer may conduct an arrest for a misdemeanor only when specifically authorized by statute or when the offense conduct occurs in the presence of the arresting officer.  Id.

that there was anyone else located in the Lear residence that could have posed a threat to the officers or other citizens.  J.S. ¶ 37.  When there is a fact in dispute, the jury must resolve the dispute.  See Harvey, 421 F.3d at 194n.12 (holding that a jury resolves disputes over "historical facts material to the qualified immunity question").

In dealing with a similar set of facts, the court of appeals found that the brandishing of a pistol alone does not constitute "articulable facts" because the presence of the weapon alone does not establish the presence of anyone in the residence, or a threat to the officers–"the touchstone of a protective sweep analysis."  Sharrar, 128 F.3d at 825.  Such is the case here. As noted previously, the parties dispute whether Mulholland knew of anyone else in the Lear residence that posed a threat to the officer.  Lear, at this point, was handcuffed and in the custody of the officers.  With respect to the issue of Mulholland's protective sweep of Lear's residence,[5] the court considering all facts in dispute in favor of plaintiff will deny defendants' motion for summary judgment relating to qualified immunity as to Mulholland.

### c.                              Involuntary Commitment

Finally, the court turns to plaintiff's third claim that Mulholland violated his constitutional rights when plaintiff was involuntarily committed pursuant to the Pennsylvania Mental Health Procedures Act ("MHPA"), 50 PA. CONS. STAT. § 50-7101 et. seq.  The Fourth Amendment applies to civil as well as criminal proceedings.  O'Connor v. Ortega, 480 U.S. 709, 714-15 (1987); Doby v. DeCrescenzo, 171 F.3d 858, 871 (3d Cir. 1999).  In proceedings such as those contemplated under the MHPA, the court's fundamental inquiry is to determine what is reasonable under the circumstances.  Cady v. Dombrowski, 413 U.S. 433, 439-40 (1973).  The

---

[5]The court finds that the second entry by Mulholland into Lear's residence, done for interrogation purposes, would be subject to the same analysis as above and that qualified immunity is not applicable for that entry either.

United States Court of Appeals for the Third Circuit held in <u>Doby</u> that the MHPA qualifies under the "special needs" exception to the warrant requirement of the Fourth Amendment.  <u>Doby</u>, 171 F. 3d at 871.

The United States Supreme Court in <u>Foucha v. Louisiana</u>, 504 U.S. 71, 80 (1992), held that state statutes, such as the MHPA, must require clear and convincing evidence that an individual suffers from mental illness and poses a danger either to himself or to others before involuntarily committing that individual to a mental health facility.  Section 50-7301 of the MHPA follows <u>Foucha</u> and provides in relevant part:

> (a) Persons Subject.–Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment.  A person is severely disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself.

50 Pa. Cons. Stat. § 7207(a).

The statute also provides a further determination for the meaning of phrase "clear and present danger."

> (b) Determination of Clear and Present Danger.–(1) Clear and present danger to other shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is reasonable probability that such conduct will be repeated. . . .

<u>Id.</u> § 7301(b).

15

There is an established constitutional right to not be involuntarily committed to a mental institution without evidence that an individual suffers from mental illness and poses a threat to himself or others.  Addington v. Texas, 441 U.S. 418, 425 (1972).  With respect to whether Mulholland is entitled to qualified immunity as to the involuntary commitment of Lear, the undisputed facts indicate that Mulholland was informed by the borough police dispatcher that a man was out in the street carrying a big gun.  Upon arriving on the scene, Mulholland was informed by L. Schmidt that Lear was loud and boisterous in tone while out in the street.  Despite attempts to establish a phone connection with the Lear residence, the telephone line remained busy shortly after Mulholland's arrival.  After leaving Lear's house, Mulholland was informed that the gun Lear had been carrying in the street was a pellet gun.   J.S. ¶ 47.  During a conversation, Lear told Mulholland that he carried the gun into the street to scare his neighbors and that he was going "to fix them."

Under the third step of the analytical framework the court finds that a reasonable officer, knowing the applicable law, could find that Lear was a danger to himself or others.  Lear's behavior was extremely erratic.  In addition, the fact that Lear wanted "to fix" and scare his neighbors with a non-lethal pellet gun only serves to support the argument that Lear's state of mind may not have been normal.  Finally, despite Lear complaining about damage to his driveway, Mulholland, upon inspecting Lear's driveway, found nothing out of the ordinary, nor any evidence of damage.  Ex. F, pgs. 87-8.  Plaintiff attempts to counter this fact by alleging that Couch did observe damage to Lear's driveway in the form of a "whitish" liquid.  Ex. B, pgs. 44-5.[6]  The court, however, must consider the information in Mulholland's possession when he was

---

[6]While plaintiff cites to the record, the court notes that the pages referred to by plaintiff were not included in the exhibits.  The court, therefore, cannot find this fact in the record, but considers it only an allegation.  As discussed, even if this allegation were proven, it is not

considering whether to involuntarily commit plaintiff.  See Sharrar, 128 F.3d at 826 ("the inquiry is whether a reasonable officer could have believed that his or her conduct was lawful in light of the clearly established law and *the information in the officer's possession*")(emphasis added).  In this case the court must consider what Mulholland knew at the time of his decision, not what was perceived by others.

These facts are enough to satisfy defendant's burden that a reasonable officer could conclude that Lear was a danger to himself or others and should be involuntarily committed. Defendants' motion for summary judgment on the issue of qualified immunity for Mulholland as to the involuntary commitment of Lear is granted.[7]

## II.    Municipal Liability–Claims Against the Borough

All of plaintiff's claims are asserted against both Mulholland and the borough. Defendants' motion seeks summary judgment on all of plaintiff's claims asserted against the borough arguing that plaintiff failed to show that the borough used a policy or custom that deprived Lear of his civil rights.

The United States Supreme Court in Monell v. New York City Dept. of Social Services, 436 U.S. 658, 694-95 (1978), held that a municipality can be found liable under 42 U.S.C. § 1983 [8] only when the municipality itself causes the constitutional violation.  City of Canton, Ohio

---

dispositive as the issue turns on the information possessed by Mulholland, not observations perceived by Couch.

[7]As the court granted defendants' motion for summary judgment with respect to qualified immunity for Mulholland relating to the involuntary commitment of Lear, the court need not address defendants' argument for Mulholland's immunity on this claim under the MHPA.

[8]42 U.S.C. § 1983 provides, in relevant part, that: "Every person who, under color of any statute, ordinance, regulation, custom or usage...subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured

v. Harris, 489 U.S. 378, 387 (1989); Carswell v. Borough of Homestead, 381 F.3d 235, 244 (3d Cir. 2004).  The Court specifically recognized in Monell and City of Canton, that *respondeat superior* or vicarious liability will not attach under section 1983.[9]  Id.  Under section 1983, a municipality will be liable only when the "execution of the government's policy or custom...inflicts the injury."  Monell, 436 U.S. at 694.  District courts are instructed to evaluate claims for municipal liability "independently of the section 1983 claims against the individual police officers."  Carswell, 381 F.3d at 244; Kneipp v. Tedder, 95 F.3d 1199, 1213 (3d Cir. 1996); Fagan v. City of Vineland, 22 F.3d 1283, 1294 (3d Cir. 1994).

This court, accordingly, must begin its inquiry in cases alleging municipal liability under section 1983 by considering "whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  City of Canton, 489 U.S. at 387.  "A plaintiff must identify a municipal policy or custom that amounts to deliberate indifference to the rights of people with whom police come into contact."  Carswell, 381 F.3d at 244 (citing City of Canton, 489 U.S. at 388).

The Supreme Court directly addressed the issue whether a municipality could be held liable under section 1983 if a municipal employee employed a constitutionally valid policy in an unconstitutional manner in City of Canton.  Id.  The Court in City of Canton expressly rejected the notion advanced by a municipality that only unconstitutional policies are actionable under § 1983.  Id.  The Court held that a municipality, under section 1983, can be held liable for

in an action at law, suit in equity, or other proper proceeding for redress...."

[9]"Nor, without more, would a city automatically be liable under § 1983 if one of its employees happened to apply the policy in an unconstitutional matter, for liability would then rest on *respondeat superior*.  City of Canton, 489 U.S. at 379.

inadequate training of its employees.[10]  Id.  "We hold today that the inadequacy of police training

may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate

indifference to the rights of the persons with whom the police come into contact."  Id.

Merely alleging that a training program for municipal employees is a policy of that

municipality is not sufficient to implicate a constitutional issue.  Id. at 390.  This court, when an

issue concerning a training program is raised, will need to determine: "whether that training

program is adequate; and if it is not, the question becomes whether such inadequate training can

justifiably be said to represent 'city policy'."  Id.   In City of Canton the Court found that there

may be cases where the need for training or schooling is so obvious, and the lack of training so

likely to result in constitutional violations, that it can reasonably be inferred that the municipality

was deliberately indifferent to the need.  Id.  In those cases, the failure to train may be seen as a

city policy "for which the city may be held liable if it actually causes injury."  Id.

Typically, a plaintiff proves that a municipal policy or custom amounts to deliberate

indifference to the constitutional rights of citizens by showing a pattern of constitutional

violations.  Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000).  "Although it is

possible, *proving deliberate indifference in the absence of such a pattern is a difficult task*."  Id.

(emphasis added).

> If, as here, the policy or custom does not facially violate federal
> law, causation can be established only by "demonstrat[ing] that the
> municipal action was taken with 'deliberate indifference' as to its
> known or obvious consequences.  A showing of simple or even
> heightened negligence will not suffice."

Id.  (quoting Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 407 (1997)).

---

[10]  Prior to City of Canton, the United States Court of Appeals for the Third Circuit had
not yet explicitly recognized this claim, but seemed at least implicitly to recognize it.  Colburn v.
Upper Darby Township, 838 F.2d 663, 672-73 (3d Cir. 1988).

In addition to proving deliberate indifference, a plaintiff must also show causation. Carswell, 381 F.3d at 244. "There must be 'a direct, causal link between a municipal policy or custom and the alleged constitutional deprivation.'" Id. (quoting Brown v. Muhlenberg Township, 269 F.3d 205, 214 (3d Cir. 2001)).

Plaintiff appears to be raising two theories for imposing municipal liability on the borough. First, plaintiff argues that his rights were violated due to the borough's failure to train its police officers adequately with respect to involuntary commitment of a person for mental health reasons. Second, plaintiff argues that the borough's policies and procedures were the cause of the deprivations of Lear's Fourth Amendment rights against unreasonable search and seizure.

### a.      Inadequate Training

The court will first address the issue of inadequate training as it relates to Lear's involuntary commitment. Defendants move for summary judgment if favor of the borough on the ground that plaintiff did not present facts that would support a finding that the borough in the training of its officers, or failure to train, reflected a deliberate indifference to the constitutional rights of the borough's residents.

The court agrees with defendants and will grant summary judgment in favor of the borough on plaintiff's claims against the borough for failure to train. In response to defendants' motion for summary judgment as to municipal liability, plaintiff offered a report by Paul M. Bernstein, Ph.D., Director of Pennsylvania Psychological Services ("Bernstein"). Bernstein stated in his report: "There is nothing in the information supplied by Ms. Schmidt, or observed by the police officers that warranted a conclusion that justified a 302 Commitment of Mr. Lear." Exhibit Q at 2. Bernstein also stated: "The videotape of Ronald J. Lear in lock-up at the

Brentwood Police Department does not, in my opinion, indicate or even suggest that Mr. Lear

was in imminent danger of harming himself or others.  Although upset and insistent, Mr. Lear's

continual requests for legal representation were appropriate and proper."  <u>Id.</u> at 3.

Bernstein's report contains one paragraph addressing the issue of training of the

borough's police officers in dealing with involuntary commitments.  Bernstein concluded that

section by stating:

> With respect to the procedures police should employ when dealing
> with persons with psychiatric problems, and the criteria required
> for an involuntary psychiatric commitment, the only training
> Brentwood police officers receive is to annually review
> Commonwealth of Pennsylvania bulletins.  This is Inadequate
> [sic].  Police officers should be provided with ongoing training by
> mental health and legal professionals so that they can recognize the
> behaviors that would necessitate the involuntary commitment of a
> person.

<u>Id.</u> at 4.

The statements contained in Bernstein's report are the bases upon which plaintiff attempts

to show the borough's liability for failure to train its police officers regarding involuntary

commitments.  Plaintiff did not present any evidence of past problems or abuses by the borough's

police department regarding involuntary commitments and plaintiff did not present evidence of a

pattern of behavior by the borough's police department that would indicate that its policies

amount to indifference to its citizens' constitutional rights.

The United States Supreme Court in <u>Board of County Comm'rs of Bryan County v.</u>

<u>Brown</u>, 520 U.S. 397 (1997), discussed its prior holding in <u>City of Canton</u> and explained

plaintiff's burden in proving municipal liability in failure to train cases.  The Court stated:

> In leaving open in <u>Canton</u> the possibility that a plaintiff might
> succeed in carrying a failure-to-train claim without showing a

21

> pattern of constitutional violations, we simply hypothesized that, in a *narrow range of circumstances*, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officials with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking in specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected a "deliberate indifference" to the obvious consequence of the policymakers' choice–namely, a violation of a specific constitutional or statutory right.

<u>Board of County Comm'rs of Bryan County v. Brown</u>, 520 U.S. at 409 (emphasis added).

Regarding the training of borough police officers, borough police chief Robert Butelli ("Butelli") testified that "very few" individuals are subject to involuntary commitments. Exhibit A, at 24. Butelli also testified that, in addition to receiving training at the police academy, borough police officers receive mandatory, yearly updates on dealing with citizens with mental health issues. <u>Id.</u> at 22. Finally, Butelli noted that borough police officers attended a two-day class on how to deal with mentally disturbed citizens within the last two to three years. <u>Id.</u>

Butelli's testimony is buttressed by the report of Joseph T. Stine ("Stine"). Exhibit T, at 16. In that report, Stine states:

> Police Officers in the Commonwealth of Pennsylvania receive mandatory in service training every year. That training is administered under the auspices of the Municipal Police Officers Training an [sic] Education Commission (M.P.O.T.E.C.). Every police officer in the state must attend this training. At the end of each class the officers must pass a test. Failure to attend the class and pass the test results in the revocation of a police officers certification to be a Law Enforcement Officer. In 2002 that training included a course entitled Mental Health and Behavior Health Issues.

Exhibit T, at 16.

As stated in <u>City of Canton</u>, a plaintiff may not prevail on a failure to train claim by merely alleging that the municipality's training program is inadequate.  <u>City of Canton</u>, 489 U.S. at 390; <u>see</u> <u>Harvey</u>, 421 F.3d at 196-97.  Despite this holding, plaintiff offers only Bernstein's report and asserts that borough police officers should be subject to ongoing training in dealing with mentally disturbed citizens.  Without evidence regarding the frequency of encounters with mentally disturbed citizens or evidence of incidents similar to plaintiff's situation, the court cannot find the training program inadequate.

When reviewing claims for violations of constitutional rights, courts must exercise caution to not adopt lesser standards of fault and liability through the use of hindsight.  "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident."  <u>City of Canton</u>, 489 U.S. at 390 (quoting <u>Oklahoma City v. Tuttle</u>, 471 U.S. 808, 823 (1985)).

In this case the evidence adduced is that borough police officers are trained in dealing with citizens with mental issues at the police academy, during yearly briefings, and at a conference held within the last three years.  Mulholland, prior to arriving on the scene, received a dispatcher call that stated that plaintiff was in the street holding a gun.  Mulholland was also informed of that situation upon speaking with L. Schmidt, who told Mulholland that plaintiff was loud and boisterous while out in the street, but that she could not hear or understand what he was saying.  In addition, despite attempts by the borough's dispatcher, a phone connection between the borough and the Lear residence was not able to be established.  Finally, during Lear's conversation with Mulholland, Lear told Mulholland that he was waving a gun to scare his neighbors and that he was going to "fix" his neighbors.

23

The Supreme Court in <u>City of Canton</u> instructed district courts to consider, in cases such as this: "Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?"  489 U.S. at 390.

Second-guessing the training procedures of the borough, however, is not sufficient to meet that inquiry.  The Court in <u>City of Canton</u> held that to do so would "engage the federal courts in an endless exercise of second-guessing municipal employee-training programs.  This is an exercise we believe the federal courts are ill-suited to undertake, as well as one that would implicate serious questions of federalism."  <u>City of Canton</u>, 489 U.S. at 390.

Without evidence that other citizens in the borough were subject to involuntary commitments and after considering the training programs employed by the borough and the information known to Mulholland at the time of the incident, this court finds that the borough's failure to train does not rise to the level of deliberate indifference to the constitutional rights of its inhabitants.  The court, accordingly, will grant summary judgment in favor of the borough with respect to plaintiff's section 1983 claim against the borough relating to his involuntary commitment.

**b.      Remaining Fourth Amendment Claims**

Defendants also move for summary judgment with respect to the remainder of plaintiff's Fourth Amendment claims against the borough.  With respect to the Fourth Amendment issues, plaintiff is proceeding under a theory that the borough's policies, practices, and procedures were the cause of the alleged violations of plaintiff's constitutional rights.  As stated above under section 1983, a municipality will be liable only when the "execution of the government's policy or custom...inflicts the injury."  <u>Monell</u>, 436 U.S. at 694.  In this case, plaintiff alleges that the violations of plaintiff's Fourth Amendment rights resulted from a borough policy that "left it to a

24

police officer's discretion whether a warrant should be obtained before making an in-home

arrest." Pl's. Brief at 1.  Butelli admitted that officers have discretion as to when and how to

make arrests.

> Question:    But is it your opinion, though, that Officer
> Mulholland's conduct was consistent with the
> practice of the Brentwood Police Department, as
> you understood it?
>
> Answer:      That was one avenue he could take.  The officers
> have discretionary power.  You don't arrest
> everybody that you come in contact with.  They can
> use discretion on [sic] certain situations.

Exhibit A, at 73.

Under this theory, municipal liability attaches only when "the execution of a

government's policy or custom, whether made by its lawmakers or by those whose edicts or acts

may fairly be said to represent official policy, inflicts the injury." Monell, 436 U.S. at 694.  A

municipal policy is made when a "decisionmaker possess[ing] final authority to establish

municipal policy with respect to the actions' issues an official proclamation, policy, or edict."

Berg, 219 F.3d at 275; Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990).  A

plaintiff may prove custom "by proof of knowledge and acquiescence."  Fletcher v. O'Donnell,

867 F.2d 791, 793-94 (3d Cir. 1989); see Monell, 436  U.S. at 275(holding that customs are

"practices of state officials...so permanent and well settled.").

In this case, plaintiff offered little evidence to support his theory other than Butelli's

statement that officers have discretionary power.  The court of appeals in Bielevicz v. Dubinon,

915 F.2d 845, 851 (3d Cir. 1990), stated that a plaintiff need not show that municipality had an

express or formal procedure.  Drawing all inferences in light more favorable to the non-movant,

the court will conclude, as to this first prong of the test, that Butelli's statement is enough to satisfy plaintiff's burden.

A showing of a policy or custom, in and of itself, however, is not sufficient for a plaintiff to maintain a section 1983 action.  Id. at 850.  After identifying a municipal policy or custom, plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury."[11]  Bryan County, 520 U.S. at 404.  In Bryan County the Supreme Court held that causation, i.e., the moving force, is established by "demonstrat[ing] that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences.  A showing of simple or even heightened negligence will not suffice."  Id. at 407.

The policy or custom alleged by plaintiff, that borough police officers have discretion in certain situations whether to seek a warrant prior to an in-house arrest, does not facially violate federal law because as discussed previously there are certain circumstances – exigent circumstances – which justify a warrantless arrest.  See Olson, 495 U.S. at 100.  As the policy or custom alleged does not facially violate federal law, the court must be "rigorous" in analyzing the rules of culpability and causation.  "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."  Id. at 407.

The Court in Bryan County reiterated that its standard, as mentioned in City of Canton, for municipal liability under section 1983 is deliberate indifference.  To be liable, a municipality must have "disregarded a known or obvious consequence of [its employees'] action."  Id. at 410.

_____

[11]Under section 1983, the culpability of a municipality is established by proving that the municipality's legislative body or authorized decisionmaker intentionally deprived a plaintiff of a federally protected right.  Bryan County, 520 U.S. at 407.

Plaintiff made no showing that the borough's policymakers were aware of unlawful conduct regarding warrantless arrests or searches in the past or that the borough had any reason to suspect that its policies, customs, or practices were causing constitutional violations. Decisions in which courts found causation dealt with extreme circumstances where specific evidence of knowledge of or acquiescence in the face of evidence of past constitutional violations was presented.  See Brandon v. Holt, 469 U.S. 464 (1985)(holding that continued official tolerance of repeated misconduct facilitates similar actions in the future); Bielevicz, 915 F.2d at 852-54(holding that testimony by several witnesses of past arrests without probable cause established causation); Colburn v. Upper Darby Township, 838 F.2d 663 (3d Cir. 1988)(holding that the township's inaction in response to two prior suicides showed causation when plaintiff alleged lax supervision in the township's jail).

There is no evidence of record to indicate that there were past violations similar to the incidents in this case or even knowledge on the part of the borough that this custom may lead to constitutional violations.  This case is not like Berg where a "simple mistake could lead to a constitutional violation." 219 F.3d at 277.  Plaintiff failed to show that the borough was aware of other constitutional violations or that there was a significant chance of violations due to its policy.  The evidence of record, taken in the light most favorable to plaintiff, would permit this court to infer only that Mulholland improperly followed the borough's directives.  To find liability for the borough in the circumstances of this case would amount to *respondeat superior* liability.  See Bryan County, 520 U.S. at 403 ("We also recognized [in Monell] that a municipality may not be held liable under § 1983 solely because it employs a tortfeasor."); Monell, 436 U.S. at 691 (holding that a municipality cannot be held liable on the basis of *respondeat superior* under section 1983).  By reason of there being no basis for municipal

liability under either theory advanced by plaintiff, this court will grant summary judgment in favor of the borough on all of plaintiff's Fourth Amendment claims against it.

### III.    Plaintiff's Fourth Amendment Claims

The parties filed cross-motions for summary judgment with regard to plaintiff's Fourth Amendment claims for an illegal seizure and the warrantless search or protective sweep of plaintiff's residence.[12]

#### a.    Illegal Seizure

Plaintiff's first claim alleges an illegal seizure by Mulholland in violation of plaintiff's Fourth Amendment rights.  "Although police may make a warrantless search in a public place if they have probable cause to believe the suspect is a felon, 'the Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."  Sharrar, 128 F.3d at 819(quoting Payton v. New York, 445 U.S. 573, 590 (1980)).  The issue of when an arrest actually occurs has been repeatedly litigated.  As discussed previously, two decisions illustrate the issue.  In Delgado, 466 U.S. at 215, the United States Supreme Court held that a person is seized, for Fourth Amendment purposes, "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."   Later, in Hodari D., 429 U.S. at 626, the Supreme Court held that an arrest is characterized as requiring either physical force or submission to the assertion of authority.

---

[12]The parties also filed cross-motions for summary judgment on plaintiff's claim that his involuntary commitment was a violation of his Fourth Amendment rights.  As the court determined that Mulholland is entitled to qualified immunity and the borough is not subject to municipal liability as to that claim, the court will not address the merits of that claim.

The parties agree that Lear was arrested without a warrant.  Defendants argue that exigent circumstances permitted Mulholland to arrest plaintiff.  The government, or borough in this case, bears the burden of showing that exigent circumstances existed to overcome the presumption that home arrests made without a warrant are unreasonable.  Welsh, 466 U.S. at 750.  The United States Supreme Court, in Olson, found that the Minnesota Supreme Court correctly outlined the parameters of exigent circumstances in this context. "[A] warrantless intrusion may be justified by hot pursuit of a fleeing felon, or imminent destruction of evidence, ... or the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling." Id. (quoting State v. Olson, 436 N.W.2d 92, 97 (Minn. 1989))(citations omitted);  see Sharrar, 128 F.3d at 820 (quoting Olson).

In this case, the exigent circumstances relate to the risk of danger of the police or to other persons inside or outside the Lear residence.  There are disputed facts with respect to plaintiff's behavior before Mulholland arrived, relating to Mulholland's arrival and with respect to plaintiff's conduct during his discussion with Mulholland.  J.S. ¶¶ 11, 18, 22, 32-35.  The parties also dispute how Lear exited his house and whether he was ordered or voluntarily stepped outside of his residence.  J.S. 32-35.

Based upon the facts in dispute, the court finds that material issues relating to the exigent circumstances surrounding the seizure of Lear are in dispute and summary judgment is not appropriate.  Accordingly, plaintiff's and defendants' motion for summary judgment with respect to liability for the seizure of Lear are denied.

**b.     Illegal Search**

Plaintiff also brings a claim for an illegal search under the Fourth Amendment.  As stated above, the United States Supreme Court defined a protective sweep as "a quick and limited

search of premises, incident to an arrest and conducted to protect the safety of police officers and others." Buie, 494 U.S. at 327.  The Buie court further held that the sweep must be limited to searches of "closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Id. at 334.  If a search goes beyond the immediate, adjoining area, there must be "articulable facts" which would warrant a reasonable police officer "to believe that there are individuals who pose a danger in other areas of the house." Sharrar, 128 F.3d at 822 (quoting Buie, 494 U.S. at 334).

In Sharrar, the United States Court of Appeals for the Third Circuit resisted imposing a bright line rule limiting protective sweeps to in-home arrests.  Id. at 824.  Instead, the court held that protective sweeps should be considered under the "articulable basis" standard outlined by the Supreme Court in Buie.  Id.

The court finds that there are material issues of fact with respect to whether there were exigent circumstances surrounding the protective sweep in dispute and summary judgment is not appropriate.  The parties dispute whether Mulholland knew there were other people in the Lear residence who could have posed a threat to the officers or other citizens.  J.S. ¶ 37.  This is particularly important as the officers may have been concerned about who had possession of the gun that Lear was waving in the street.  Only after the search and when Lear's wife gave the gun to Fisher did it become known to Mulholland that the gun in question was a pellet gun.  J.S. § 45, 47.  Accordingly, plaintiff's motion and defendants' motion for summary judgment as to liability for the search of Lear's residence are denied.

**IV.     Punitive Damages**

Mulholland moves for summary judgment on the issue of punitive damages.[13]  Punitive

damages may be awarded by a jury on section 1983 claims when "the defendant's conduct is

shown to be motivated by evil motive or intent or when it involved reckless or callous

indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983);

see Coleman v. Kaye, 87 F.3d 1491, 1497 (3d Cir. 1996)(quoting Smith v. Wade).  The purpose

of punitive damages is to punish the behavior of defendants and to deter others from similar

behavior.  Allah v. Al-Hafeez, 226 F.3d 247, 252 (3d Cir. 2000)(citing Memphis Community

School Dist. v. Stachura, 477 U.S. 299, 306n.9 (1986)).

The court finds that there are substantial facts in dispute as to the motive and intent of

Mulholland.  J.S. ¶¶ 37, 49, 61, 62, 63.  By reason of the disputed material facts, the court will

deny defendants' motion for summary judgment on the issue of punitive damages.  The court

finds that it is for a jury to decide whether Lear acted with the requisite motive and intent for

punitive damages to be awarded.

### *Conclusion*

After reviewing the undisputed material facts of record, the court determines that (1)

plaintiffs' motion for partial summary judgment shall be denied in its entirety and (2) defendants'

motion for summary judgment (i) shall be granted with respect to all claims against the borough,

(ii) by reason of Mulholland's entitlement to qualified immunity, shall be granted with respect to

plaintiff's claim against Mulholland relating to plaintiff's involuntary commitment and (iii) shall

---

[13]As summary judgment will be granted by this court with respect to all claims against
the borough, the court considers the issue of punitive damages as it relates only to Mulholland.

be denied with respect to plaintiff's other claims against Mulholland, as well with respect to the issue of punitive damages.

***Order***

**AND NOW**, this 23rd day of February, 2006, upon consideration of the parties' arguments and supporting documents

**IT IS ORDERED** that plaintiff's motion for partial summary judgment (Doc. No. 43) is **DENIED** and defendants' motion for summary judgment (Doc. No. 41) is **GRANTED** in favor of the Borough of Brentwood on all claims against it and is **GRANTED IN PART and DENIED IN PART** with respect to the plaintiff's claims against Officer Milton Mulholland, III.

By the court:

<u>/s/ Joy Flowers Conti</u>
Joy Flowers Conti
United States District Judge

cc:  Counsel of Record